## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| In re Gluth Bros. Construction, Inc.,<br><br>Debtor.<br><br>-------------------------------------------------<br>Charles Dixon and Charles Graeber, Jr.,<br>not in their individual capacities but<br>solely as Trustees of the Gluth Bros.<br>Construction, Inc. Creditor Trust,<br><br>Plaintiff,<br><br>v.<br><br>American Community Bank & Trust,<br><br>Defendant. | Bankruptcy No. 07-B-71375<br>Adversary No. 09-A-96132<br>Chapter 11<br>Judge Manuel Barbosa |

### MEMORANDUM OPINION

This matter comes before the Court on the Defendant's combined Motion to Dismiss Adversary Complaint and Motion to Strike. For the reasons set forth herein, the Court will grant the Defendants' motion in part and deny in part.

### JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (F), (K), and (O).

## FACTS AND BACKGROUND

### A. Background on the Parties

The following facts and procedural history are taken from Plaintiff's adversary complaint and opposition to Defendant's motion to dismiss and strike, as well as Defendant's combined motion to dismiss and strike, memorandum in support of motion to dismiss and strike, and reply to Plaintiff's opposition (collectively, the "pleadings"), and from all attachments to the pleadings referred to and incorporated therein. Because the matter is before the Court on a motion to dismiss, the Court accepts as true all of the factual allegations contained in the adversary complaint. See, e.g., Erickson v. Pardus, 551 U.S. 89, 93-94 (2007); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007).

The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court on June 5, 2007. On March 4, 2009, the Court entered an order confirming the Plan of Liquidation Dated January 27, 2009 (the "Plan"). Pursuant to the Plan, and the Gluth Bros. Construction, Inc. Creditor Trust Agreement, entered into among the Debtor, the Official Committee of Unsecured Creditors and the Creditor Trustees, all remaining property of the Debtor's estate, including causes of action, were vested in the Creditor Trust, and the Creditor Trustees were granted the authority to commence actions.

The Defendant is a banking association, organized under the laws of the State of Illinois, with its principal place of business in Woodstock, Illinois. The Debtor is a Delaware corporation, with its principal place of business in Woodstock, Illinois. It appears that all of the relevant facts occurred in the State of Illinois.

**B. The Loan from Defendant to Debtor and Related Collateral**

On March 14, 2000, the Defendant lent a principal amount of $2,000,000 to the Debtor. In connection with the loan, the parties signed a promissory note, which provided for interest and fees and had an initial maturity date of July 1, 2001. On July 1, 2002, the Debtor and Defendant entered into a change-in-terms agreement, reducing the principal amount of the promissory note to $1,000,000 and extending the maturity date of the promissory note through July 1, 2003.[1] On July 1, 2003, the Debtor and the Defendant entered into a change-in-terms agreement, extending the maturity date of the promissory note through January 1, 2004. On January 1, 2004, the Debtor and the Defendant entered into a change-in-terms agreement, extending the maturity date of the promissory note through September 1, 2004, and requiring the Debtor to obtain a personal guarantee from the Debtor's sole shareholder and president, Frank Gluth ("Mr. Gluth"). On September 1, 2004, the Debtor and the Defendant entered into a change-in-terms agreement, extending the maturity date of the promissory note through September 1, 2005, and reaffirming the Debtor's obligation to obtain a personal guarantee from Mr. Gluth. On April 6, 2005, the Debtor and the Defendant entered into a change-in-terms agreement, which extended the maturity date of the promissory note through April 1, 2006, and pursuant to which the Defendant advanced an additional $1,000,000 in principal under the amended promissory note, thereby increasing the outstanding principal amount to $2,000,000. In connection with the April 2005 change-in-terms agreement, Mr.

---

[1]The facts alleged in the Adversary Complaint are unclear whether the maturity date was extended prior to the original maturity date of July 1, 2001. The Adversary Complaint is also unclear whether there were any payments of principal prior to the change-in-terms agreement on July 1, 2002, but presumably, the principal amount was "reduced" by a payment of $1,000,000 in principal on or about July 1, 2002.

Gluth granted the Defendant a mortgage in his personal residence in Woodstock, Illinois. On April 6, 2006, the Debtor, the Defendant and Mr. Gluth entered into a change-in-terms agreement, extending the maturity date of the promissory note through April 1, 2007, and making Mr. Gluth a joint and several co-obligor on the promissory note. In connection with the April 6, 2006 change-in-terms agreement, Mr. Gluth, the Debtor and the Defendant entered into a Commercial Pledge Agreement, pursuant to which Mr. Gluth granted the Defendant a security interest in his personal wealth management account at the Defendant to secure the obligations under the promissory note. On April 1, 2007, the Debtor, Mr. Gluth and the Defendant entered into a change-in-terms agreement, extending the maturity date of the promissory note through December 1, 2007. As of the petition date, the principal amount outstanding on the promissory note was $1,991,000.

The Plaintiff alleges that the Debtor became insolvent at some point prior to filing its bankruptcy petition. The Plaintiff points to "(1) the precipitous thirty-percent (30%) decline in the Debtor's revenues from the year ending March 31, 2006 through the year ending March 31, 2007; (2) the Debtor's history of late interest payments on the Promissory Note; (3) the substantial decline in the Debtor's new projects in the several years prior to the Petition Date; (4) the Debtor's inability to collect on its accounts receivable; (5) the Defendant's requirement that Gluth become a joint and several co-obligor on the Promissory Note obligations; and (6) the Debtor's reliance on Gluth to support the Debtor's operations, and to satisfy its obligations under the Promissory Note, as evidenced by the substantial advances by Gluth to the Debtor prior to the Petition Date." (Compl. ¶81). The Debtor made monthly interest payments to the Defendant on the loan, including payments of $12,775.57 on March 9, 2007, $14,144.39 on April 2, 2007, and $13,688.12 on May 10, 2007.

(Compl. ¶ 102).

In connection with the promissory note, the Debtor granted the Defendant a security interest in substantially all its business assets, which were composed of cash holdings, accounts receivable, trucks and trailers, office equipment, and other machinery and equipment (including loaders, bulldozers, hydraulic excavators, graders, elevated scrapers, trenchers, rollers, backhoes, dump trucks, motor graders, hydraulic compactors, and mobile office units) used in the Debtor's business. On April 19, 2002, the Defendant filed a UCC-1 financing statement with the Delaware Division of Corporations, listing the collateral as all inventory, chattel paper, accounts, equipment, investment property, deposit accounts and general intangibles, whether owned now or acquired after and all additions, replacements, substitutions, records or proceeds thereof. On November 30, 2006, the Defendant filed a continuation statement with the Delaware Division of Corporations. However, with respect to the collateral consisting of titled vehicles, the Defendant never delivered the existing certificate of titles or applications for certificate of title and application fees to record its liens with the Illinois Secretary of State.

On September 12, 2007, the Court entered an order authorizing the Debtor to sell by auction certain of its non-core assets, including construction equipment such as excavators, loaders, dozers, trenchers, graders and rollers, and various motor vehicles such as trucks. The order provided that any liens on the auctioned equipment would attach to the proceeds of the sale, and that no proceeds would be distributed pending further order of the Court. On September 29, 2007, the Debtor conducted an auction which yielded $1,053,933.50 in proceeds. On November 5, 2007, the Court entered an agreed order authorizing the turnover of the auction proceeds to the Defendant, but further

providing that the turnover was without prejudice to any claims or causes of action that may be

brought against the Defendant by the Debtor or the Committee of Unsecured Creditors (or their

successors). Some time prior to January 23, 2008, Mr. Gluth paid the Defendant $1,051,754.20 out

of his personal funds on account of his joint and several obligations on the promissory note.

Together with the proceeds from the auction, the amounts outstanding to the Defendant on the

promissory note were thereby paid in full.

### C. Requests for Documents

After confirmation of the Plan on March 4, 2009, the Plaintiff made repeated demands in

writing that the Defendant turn over all property of the Debtor in its possession or control, including

bank account statements and other records regarding the Debtor's accounts at the Defendant that the

Debtor failed to list in its bankruptcy schedules. On May 29, 2009, the Defendant turned over

certain of these requested records, but did not produce cancelled checks or statements for the

undisclosed accounts.

### D. Relations between the Principals of the Defendant and the Debtor

The Plaintiff alleges that the Debtor's sole shareholder, Mr. Gluth, has had a close

relationship with several of the principals of the Defendant. Mr. Gluth served on the board of

directors of the Defendant from December 2000 through May 2004. The Defendant's current chief

executive officer is Charie Zanck, whose husband, Thomas Zanck, was Mr. Gluth's personal counsel

in certain matters with respect to the Debtor's bankruptcy case, but is no longer counsel in such

matters. The Defendant's founding member is Chuck Ruth ("Mr. Ruth"), who continues to serve

on the Defendant's board of directors. Shortly before the petition date, Mr. Ruth offered to purchase

several parcels of real estate from Mr. Gluth for $3.6 million, some of which were owned by Mr.

Gluth and some of which were owned by the Debtor, but the transaction failed to close prior to the

petition date. On May 14, 2007, the Debtor sold its interest in a joint venture between the Debtor

and a company affiliated with Mr. Ruth to Mr. Ruth for $30,921.90, even though the Plaintiff alleges

the joint venture interest was worth far in excess of that amount. The Plaintiff also alleges that the

joint venture may have been in possession of certain equipment of the Debtor at the time of sale.

The Debtor had several active accounts at the Defendant which the Debtor failed to list in its

bankruptcy schedules. Between October 2007 and December 2007, Mr. Ruth paid Mr. Gluth a total

of $2.8 million in what was purportedly in exchange for 40,000 shares in the Defendant, even though

the Plaintiff alleges that the Mr. Gluth never owned more than 5,000 shares.

## DISCUSSION

### Standard under 12(b)(6), Rule 8 and Rule 9(b)

A motion to dismiss under Fed. R. Civ. P. 12(b)(6), made applicable by Fed. R. Bankr. P.

7012,[2] tests the sufficiency of the complaint, rather than the merits of the case. In re Irmen, 379 B.R.

299, 307 (Bankr. N.D. Ill. 2007) (citing Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir.

1990)). Under Rule 12(b)(6), a court must take as true all facts alleged in the complaint and construe

all reasonable inferences in favor of the plaintiff. See Murphy v. Walker, 51 F.3d 714, 717 (7th Cir.

1995); Neiman v. Irmen (In re Irmen), 379 B.R. 299, 307 (Bankr. N.D. Ill. 2007).

The Debtor argues that the Plaintiff's Adversary Complaint does not adequately plead the

---

[2]Unless otherwise noted, references to Rules herein shall be references to the Federal
Rules of Civil Procedure, as incorporated by the relevant Federal Rule of Bankruptcy Procedure.

claims for relief under Rule 8, or meet the higher pleading standards for fraud under Rule 9(b), and

should therefore be dismissed under Rule 12(b)(6). Under Rule 8(a), a pleading for a claim for relief

must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8. The "Rule reflects a liberal notice pleading regime, which is intended to focus

litigation on the merits of a claim rather than on technicalities that might keep plaintiffs out of

court." Brooks v. Ross, 578 F.3d 574, 580 (7th Cir. Aug. 20, 2009) (citing Swierkiewicz v. Sorema

N.A., 534 U.S. 506, 514 (2002)). The focus of the Rule is to "give the defendant fair notice of what

... the claim is and the grounds upon which it rests." Brooks, 578 F.3d at 581 (citing Erickson v.

Pardus, 551 U.S. 89, 93 (2007)). While this does not require "detailed factual allegations," a

"formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 129 S. Ct.

1937, 1949 (May 18, 2009). Instead, the complaint must contain "enough facts to state a claim to

relief that is plausible on its face." Twombly, 550 U.S. at 570. The plausibility standard is not a

"probability standard," but it is higher than mere possibility, so the well-pleaded facts cannot be

"merely consistent with a defendant's liability," but must demonstrate a plausible "entitlement to

relief." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556-57). As the Seventh Circuit

Court of Appeals has recently stated, "courts must accept a plaintiff's factual allegations as true, but

some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice

to defendants of the plaintiff's claim." Brooks, 578 F.3d at 581.

Where fraud is alleged, a more rigorous pleading standard comes into play. In re Jacobs, 403

B.R. 565, 573 (Bankr. N.D. Ill. Apr. 9, 2009). "In alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake." Id. (quoting Fed. R. Civ. P. 9(b)).

Thus, a plaintiff must state the "'who, what, when, and where' of the alleged fraud." Id. (quoting

Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992)). An adversary complaint

should not merely assert allegations that "are conclusory or based on 'information and belief.'"

Irmen, 379 B.R. at 310; see also John Deere Co. v. Broholm (In re Broholm), 310 B.R. 864, 875

(Bankr. N.D. Ill. 2004) (citing Veal v. First Am. Sav. Bank, 914 F.2d 909, 913 (7th Cir. 1990)). If

Rule 9(b) has not been satisfied, the Court may grant leave for movant to file an amended adversary

complaint. Kaye v. City of Milwaukee, No. 06-3139, 2007 U.S. App. LEXIS 29339, at *4 (7th Cir.

2007).

### Deepening Insolvency (Count I)

It is unclear whether deepening insolvency is recognized as a claim of action in Illinois. See,

e.g. Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.), 377 F. Supp. 2d 390, 418 (S.D.N.Y.

2005) ("Whether Illinois law recognizes a distinct cause of action for deepening insolvency is an

open question."); Fehribach v. Ernst & Young LLP, 493 F.3d 905, 908-09 (7th Cir. 2007) (calling

deepening insolvency a "controversial theory"). Some jurisdictions have held that it is only a form

of damages, not an independent cause of action. See, e.g., Gourmet Ctr., Inc. v. Fox (In re Sage

Enters., Inc.), No. 04-A-03014, 2006 WL 1722582, at *18 (Bankr. N.D. Ill. Apr. 28, 2006) (listing

cases). Other courts have rejected the theory completely. See, e.g., Wooley v. Faulkner (In re SI

Restructuring, Inc.), 532 F.3d 355, 363 (5th Cir. 2008) (rejecting deepening insolvency as both a

cause of action and as a theory of damages, in part because any harm under the theory would depend

"on how the company uses the proceeds of the loan in question and 'looks at the issue through

hindsight bias'"). As one court has noted, "loans do not of themselves deepen insolvency: they are

balance sheet neutral because the incoming loan proceeds balance the new repayment obligation. .

. . If anything, it is the unwise spending of the loan proceeds that deepen a company's insolvency."

Propex Inc. v. BNP Paribas (In re Propex Inc.), 415 B.R. 321 (Bankr. E.D. Tenn. March 5, 2009).

The court also noted that nothing would be gained from adopting the theory, since damages "are

already available for fraud and breach of fiduciary duty." Id. But at least some jurisdictions, such

as Pennsylvania, have recognized it as a tort cause of action for "an injury to the Debtors' corporate

property from the fraudulent expansion of corporate debt and prolongation of corporate life."

Official Comm. of Unsecured Creditors. v. R. F. Lafferty & Co., 267 F.3d 340, 347 (3d Cir. 2001).

      While most claims of deepening insolvency are brought against officers, directors,

accountants, or others who have a fiduciary duty to the debtor, some courts have allowed claims to

be brought against lenders. See Official Comm. of Unsecured Creditors v. Credit Suisse First

Boston (In Re Exide Techs., Inc.), 299 B.R. 732, 750-51 (Bankr. D. Del. 2003) (refusing to dismiss

where plaintiff alleged "that the Lenders caused the Debtors to acquire GNB Dunlop so that they

could obtain the control necessary to force the Debtors fraudulently to continue its business for

nearly two years at ever-increasing levels of insolvency"). However, unlike directors and

accountants, creditors have no fiduciary duty to debtors or other creditors. See, e.g., Whitley v.

Taylor Bean & Whitacker Mortgage Corp., 607 F.Supp. 2d 885, 902 (N.D. Ill. Apr. 20, 2009)

("Under Illinois law, a lender 'has no duty to refrain from making a loan if the lender knows or

should know that the borrower cannot repay the loan.'") (citing N. Trust Co. v. VIII S. Michigan

Assocs., 657 N.E.2d 1095, 1102 (Ill. App. Ct. 1995)). Therefore, the Third Circuit later clarified

that, even under Pennsylvania law, only fraudulent conduct will support a claim of deepening

insolvency and that "a claim of negligence cannot sustain a deepening-insolvency cause of action."

Seitz v. Detweiler, Hershey and Assocs., P.C. (In re CitX Corp.), 448 F.3d 672, 681 (3d Cir. 2006);

see also Buckley v. O'Hanlon, No 04-955, 2007 U.S. Dist. LEXIS 22211, at *21 (D. Del. March 28,

2007); ("A successful claim for deepening insolvency requires a showing of harm to the corporation

because of such fraud."). Illinois law also bars recovery for purely economic losses in negligence

claims under the economic loss doctrine.[3] Whitley, 607 F. Supp. 2d at 902. Therefore, the Court

believes that, even if Illinois were to recognize the theory of deepening insolvency, it would only do

so in the context of a claim of fraud.

However, the Plaintiff has failed to plead any fraudulent acts by the Defendant that led to

harm through deepening insolvency. Instead, the Plaintiff simply alleges that the Defendant agreed

to forbear on its rights under its loan agreement, agreed to extend the maturity date of the debt and,

in April 2005, agreed to loan additional funds, and that it agreed to such forbearance and

modification of its loan in exchange for personal guarantees and collateral from Mr. Gluth. No

misrepresentations have been alleged. There is no indication that these actions were concealed or

committed with a fraudulent intent to harm the Debtor or other creditors, nor were the actions

inconsistent with a normal debtor-creditor relationship. The Defendant had no fiduciary duty to the

Debtor or other creditors, and certainly had no duty (except possibly to itself or its own shareholders)

to exercise remedies with respect to the Debtor. If the Court of Appeals in Fehribach thought that

"the theory [of deepening insolvency] makes no sense when invoked to create a substantive duty of

---

[3]There is an exception to the economic loss doctrine where the claim is founded on a duty of care imposed by law, see Whitley, 607 F. Supp. 2d at 902 (citing Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank, 265 F.3d 601, 617 (7th Cir.2001)), but as mentioned above, there is no fiduciary duty for lenders under Illinois law.

prompt liquidation that would punish corporate management for trying in the exercise of its business judgment to stave off a declaration of bankruptcy," it makes even less sense to create such a duty for lenders to cause liquidation of debtors. 493 F.3d 905. Therefore, even if Illinois law were to recognize a cause of action for deepening insolvency, the Plaintiff has not pled any facts or allegations of fraudulent acts to support such a claim, and has certainly not met the standard for pleading fraud under Rule 9(b).

### Lender Liability (Count II)

The Plaintiff alleges that prior to the petition date, "the Debtor's business and financial affairs were conducted under the control and at the direction of the Defendant" and that the "Defendant's control over the Debtor's borrowings caused the Debtor's unsecured creditors to suffer substantial damages." (Compl. ¶¶ 89-92). Normally, a lender owes no fiduciary duty to a debtor, since parties to a contract "are not each others fiduciaries; they are not bound to treat the other parties with consideration for their interests." K Town, Inc. v. Metro. Bank & Trust Co. (In re K Town), 171 B.R. 313, 320 (Bankr. N.D. Ill. 1994). However, under certain circumstances, a lender "may create a fiduciary relationship by exercising improper control over a borrower." K Town, 171 B.R. at 319. In order to bring a claim for lender liability under this theory, the plaintiff must demonstrate:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
> (2) Such control must have been used by the defendant to commit fraud or worse, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Official Comm. Of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.), 277

B.R. 493, 515-16 (Bankr. S.D.N.Y. 1999) (citing Fisser v. Int'l Bank, 282 F.2d 231, 238 (2d Cir.

1960)).

However, the Plaintiff alleges no facts sufficient to support its allegation that the Defendant

controlled the Debtor, or to demonstrate any breach of duty or resulting injury. The primary action

that the Plaintiff points to in its Adversary Complaint is that the Defendant requested some

additional collateral, most of which was provided by Mr. Gluth individually, in exchange for

forbearing on its rights to declare a default, for lending an additional $1 million, and for extending

the loan's maturity date. However, none of these actions are inconsistent with a debtor-creditor

relationship. For a lender to become a fiduciary of a debtor, the lender "must exercise sufficient

authority over the corporate debtor so as to dictate corporate policy and the disposition of assets."

K Town, 171 B.R. at 320 (citing In re Badger Freightways, Inc, 106 B.R. 970, 982 (Bankr. N.D. Ill.

1989)). As the court stated in K Town, if "the lending institution usurps the power to make business

decisions from the customer's board of directors or officers, then it must also undertake the fiduciary

obligations that officers and directors owe the corporation." Id. (citing Badger, 106 B.R. at 977).

There are no allegations that the Defendant took over the business operations of the Debtor or that

it exercised any influence over the Debtor unrelated to its loan, collateral and similar rights

associated therewith. Without such a showing, a lender is "entitled to advance its own interests, and

it [does] not need to put the interests of Debtor and Debtor's other creditors first." K Town, 171

B.R. at 320 (citing Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1358

(7th Cir.1991)). While the Defendant might have had a strong bargaining position in negotiating the

change-in-terms agreements, "control does not exist simply because bargaining power was greatly skewed in favor of the lender or because the lender and debtor share a close relationship." Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. (In re S.M. Acquisition Co.), No. 05-C-7076; 2006 WL 2290990, at *5 (N.D. Ill. Aug. 7, 2006) (citing In re Kids Creek Partners, L.P. v. Leighton Holdings, Ltd., 200 B.R. 996, 1015 (Bankr. N.D. Ill. 1996)).  To the extent the Plaintiff bases its claim on the "damage" caused by lending additional funds or renegotiating terms to waive a default, extend a maturity date or lend additional funds, the Plaintiff's claim for "lender liability" seems no different than its claim for "deepening insolvency," and must similarly fail, since the Plaintiff has not demonstrated any duty that was breached or fraud committed.

Similarly, the other facts that are alleged by the Plaintiff fail to support a claim for lender liability.  The Plaintiff alleges that, by lending additional funds and not exercising its default remedies, the Defendant conspired to make the Debtor look like a viable entity, and therefore not warning other creditors of the Debtor's financial situation.  Yet, the Seventh Circuit Court of Appeals has clearly stated that a creditor has no duty to disclose information about the Debtor's financial situation and that merely continuing to lend to a debtor is not a representation about the Debtor's state.  Athey Prods. Corp. v. Harris Bank Roselle, 89 F.3d 430 (7th Cir. 1996) ("It would be like arguing that a bank becomes liable to the creditors of its borrower if the bank loan could be said to misrepresent the borrower's solvency-a theory of lender liability that would go even further than the one we rejected in Secon Service System, Inc. v. St. Joseph Bank & Trust Co., 855 F.2d 406, 419 (7th Cir.1988), where the bank was alleged to have 'project[ed] a false impression that [its borrower] would remain solvent.' A projection, prediction, or representation is one thing; a loan is

quite another."). The Plaintiff alleges that the Debtor failed to list certain accounts it had at the

Defendant in its bankruptcy schedules, but alleges no facts to support the implied proposition that

the Debtor did so upon instruction of the Defendant. The Plaintiff notes that the Defendant "never

informed the Court, the Committee, or the U.S. Trustee of such non-disclosure," and yet creditors

have no duty to correct the schedules of a debtor. Therefore, the Plaintiff has failed to plead any

facts which would support a claim for lender liability.

### Declaratory Judgment that Defendant is an Insider of Debtor (Count III)

11 U.S.C. § 101(31) defines an "insider" as:

The term "insider" includes-- ...
(B) if the debtor is a corporation--
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor;
(iv) partnership in which the debtor is a general partner;
(v) general partner of the debtor; or
(vi) relative of a general partner, director, officer, or person in control of the debtor;
[and]
(E) affiliate, or insider of an affiliate as if such affiliate were the debtor ....

11 U.S.C.A. § 101(31) (West 2009). The Plaintiff makes no allegation that the Defendant is an

officer or partner of the Debtor. The Plaintiff also makes no allegation that the Defendant owns or

controls any shares of the Debtor or otherwise has any corporate or contractual power to control the

Debtor. But, in addition to de jure control, "control" under Section 101(31)(B)(iii) can also be

established by demonstrating that the defendant has de facto control of the debtor. In re S.M.

Acquisition Co., 2006 WL 2290990, at *5 (N.D. Ill. Aug. 7, 2006) (citing In re Kids Creek, 200 B.R.

at 1015). Under this standard, "a person need not have 'legal or absolute' control of the debtor," but

it "must exercise sufficient authority to dictate corporate policy and the disposition of corporate

assets." In re South Beach Sec., Inc., 376 B.R. 881, 890 (Bankr. N.D. Ill. 2007) (aff'd by In re South

Beach Sec., Inc., Nos. 08-C-1135, 08-C-1136, 2009 WL 2222778 (N.D. Ill. July 24, 2009) (internal

citations omitted). The Plaintiff has not alleged any situations in which the Defendant exercised

such control over the Debtor. For example, while control "does not necessarily mean day-to-day

control," the Plaintiff has not alleged that the Defendant had control over anything such as

"[d]ecisions concerning the termination and replacement of executives, the release of claims, [or]

the filing of a bankruptcy petition." See Official Unsecured Creditors Comm. V. Citicorp North

Am., Inc. (In re Aluminum Mills Corp.), 132 B.R. 869, 894 (Bankr. N.D. Ill. 1991).

Because of the nonlimiting term "includes" at the beginning of the definition in the

Bankruptcy Code, it is clear that the list in the definition "is intended to be illustrative rather than

exhaustive." In re Krehl, 86 F.3d 737, 741 (7th Cir. 1996). Therefore, it also "encompasses anyone

with a sufficiently close relationship with the debtor that his conduct is made subject to closer

scrutiny than those dealing at arm's length with the debtor." Krehl, 86 F.3d at 741 (internal citations

omitted). Thus, in Krehl, the court found that, even after the debtor's president resigned his position,

he was still an insider, in part because their longstanding relationship provided him with the

information he needed to divert receivables accounts from the debtor. Krehl, 86 F.3d at 743. Courts

examine, first, if the relationship is sufficiently close "to gain an advantage attributable simply to

affinity rather than to the course of business dealings between the parties." South Beach Sec., 376

B.R at 890-91. In this inquiry, the "alleged insider's degree of control over the debtor, though

relevant, is not dispositive." Id. Second, they examine whether any transactions between the debtor

and alleged insider were conducted other than at arm's length, which is defined as transactions

"entered into in good faith in the ordinary course of business by unrelated parties with independent interests." Id.

The Plaintiff has sufficiently pled facts to support a close relationship between the Debtor and the Defendant above and beyond a mere debtor-creditor relationship, alleging that the Debtor's sole shareholder and president was on the Defendant's board of directors from 2000 to 2004, that the Defendant's CEO is the wife of the counsel of the Debtor's sole shareholder and president in matters related to this bankruptcy case, and that the Debtor may have sold interests in a joint venture to one of the Defendant's directors. However, the Plaintiff has failed to allege facts to support its argument that the Debtor and the Defendant entered into non-arm's-length transactions. The Plaintiff seems to be arguing that one or more of the "change-in-terms agreements" entered into by the Debtor and the Defendant between 2002 and 2007 were not at arms'-length, but fails to describe how they were inconsistent with an arms'-length relationship, or to describe any manipulation by the Defendant of its close relationship with the Debtor. The only thing that the Plaintiff alleges in support of its argument is that the Defendant forbore on exercising its remedies against the Debtor when it should have, in order to build up fees and interest. But, the Defendant did not need the Debtor's consent to simply not take action. Also, the Defendant received consideration to agree to waive the default and extend the maturity date, in the form of guarantees and additional collateral from Mr. Gluth. In fact, when the Plaintiff alleges the loan modifications were not at arms'-length, it is unclear whether it is claiming that the modifications were unfairly to the advantage of the Defendant or of the Debtor. As the Supreme Court stated in Iqbal, the well-pleaded facts cannot be "merely consistent with a defendant's liability," but must demonstrate a plausible "entitlement to

relief," Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556-57). However, the facts pled by

the Plaintiff are not inconsistent with an arms'-length relationship between a creditor and a debtor

in distress. It has therefore failed to plead facts sufficient to support its contention that the Defendant

was an insider of the Debtor.


### Equitable Subordination and Recharacterization (Count VII)

Section 510(c) of the Bankruptcy Code states that a court may "under principles of equitable

subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part

of another allowed claim or all or part of an allowed interest to all or part of another allowed

interest." 11 U.S.C.A. § 510(c) (West 2009). The statute codified a judge-made doctrine, and the

power is generally used if a court "determines that the claimant is guilty of misconduct that injures

other creditors or confers an unfair advantage on the claimant." In re Kreisler, 546 F.3d 863, 866 (7th

Cir. 2008). Three conditions must be satisfied before a claim should be subordinated: "(1) the

claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have

resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;

and (3) subordination must not be inconsistent with the provisions of the Bankruptcy Act." Id. (citing

United States v. Noland, 517 U.S. 535, 538-39 (1996)) (internal quotation marks omitted). Even if

these conditions are met, "equitable subordination is applied only to the extent necessary to undo the

effect of the misconduct on other creditors." Id. (citing In re Mobile Steel Co. 563 F.2d 692, 701 (5th

Cir.1977)). The type of inequitable conduct generally falls within three categories: "(1) fraud,

illegality, breach of fiduciary duties; (2) undercapitalization; and (3)[the] claimant's use of the debtor

as a mere instrumentality or alter ego." Id. (citing In re Lifschultz Fast Freight, 132 F.3d 339, 344-45

(7th Cir.1997)). However, the mere fact that a claimant lends money to an undercapitalized debtor

is not enough to demonstrate inequitable conduct, for "while undercapitalization may indicate

inequitable conduct, undercapitalization is not in itself inequitable conduct." Lifschultz, 132 F.3d

at 345. Moreover, as discussed above, the Plaintiff has failed to plead facts to support an allegation

that the Defendant is an insider of the Debtor. Where non-insider, non-fiduciary claims are involved,

"the level of pleading and proof is elevated: gross and egregious conduct will be required before a

court will equitably subordinate a claim." In re First Alliance Mortgage Co., 471 F.3d 977, 1006

(9th Cir. 2006). Here, the Plaintiff has simply failed to plead any facts that would support a finding

of such egregious conduct. All that the Plaintiff has alleged is that the Defendant continued to lend

money to the Debtor and forbore from exercising its remedies despite the dismal and potentially

insolvent state of the Debtor. This is not enough to support a claim for equitable subordination

against a non-insider with no fiduciary duty towards the Debtor or other creditors.

The Plaintiff also seeks to recharacterize the Defendant's loan to the Debtor as an equity

investment rather than a loan. Although the effect of recharacterizing a loan as equity is to

subordinate it below debt creditors, it is a separate doctrine from equitable subordination, and courts

may recharacterize debt as equity "even if the other requirements of equitable subordination are not

satisfied." In re Repository Techs., Inc., 381 B.R. 852, 864 (N.D. Ill. 2008). In making the

determination whether a debt should be recharacterized as equity capital, "courts have considered

the following factors: (1) the names given to the instruments evidencing indebtedness; (2) the

presence of a fixed maturity date and schedule of payments; (3) the presence of a fixed rate of

interest and interest payments; (4) the source of repayments; (5) the adequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) any security for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence of a sinking fund to provide repayments." Repository Techs., 381 B.R. at 864-65. This is a largely factual determination, and no single factor is controlling or decisive. Id. Unlike equitable subordination, which is based on inequitable conduct during the course of the relationship, recharacterization looks to the intent of the parties at the time the purported loan is made. See, e.g., In re Hedged-Inv. Assocs., Inc., 380 F.3d 1292 (10th Cir. 2004). The list of factors aids in the ultimate determination by the court of whether "the party infusing funds [did] so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)." Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Inc., 432 F.3d 448, 456 (3d Cir. 2006).

The transactions at issue in this case were all documented as loan transactions. The labeling is not determinative, but where a transaction is documented as a loan, "the more the transaction seems like an arms-length deal, the more likely [it] is a loan and not an equity contribution." In re S.M. Acquisition Co., 2006 WL 2290990, at *9. As discussed above, the Plaintiff has alleged no facts to support the allegation that the transactions were not at arms'-length. Also, the Defendant was not already an equity investor in the Debtor, and was not an insider of the Debtor. Therefore, the only support for recharacterization that the Plaintiff offers is the allegation that the Debtor was

in such a poor financial state at the time funds were lent that there could have been no expectation
of repayment unless the business were drastically turned around. However, the Plaintiff offers no
support for the proposition that the Debtor was in financial difficulty at the time the loan was entered
into in March 2000, and only minimal support for the fact that the Debtor was in financial difficulty
when additional funds were lent in April 2005. Moreover, there is no indication that at any time the
loan amount from the Defendant was less than the value of the collateral securing that loan or
guarantees supporting it. Instead, the facts alleged by the Plaintiff indicated that, to the extent that
the Defendant felt any insecurity at any time due to the deterioration of the Debtor's business, it
sought and was granted additional security or guarantees from Mr. Gluth. Also, rather than alleging
that the Defendant's expectation of repayment would depend solely on the success of the Debtor's
business, the Plaintiff's pleadings instead allege that the Defendant continued to forbear on its rights
even shortly before the petition date because it was confident it could be repaid through its security
despite the potential failure of the Debtor's business. Moreover, even if the Plaintiff alleges that the
Debtor was undercapitalized as a whole, there is no indication that the undercapitalization put the
Defendant's repayment prospects at risk. Because the Defendant was the senior secured lender,
undercapitalization in itself would not support recharacterization with respect to the Defendant if the
its debt was still fully secured even despite the undercapitalization. The facts alleged by the Plaintiff
seem to indicate that the Defendant was oversecured at the times it advanced funds to the Debtor.
Therefore, the Plaintiff has failed to allege sufficient facts to support its claim for recharacterization.

### Marshalling (Count X)

Marshalling is an equitable doctrine which is based upon the principle that "a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." Herzog v. NBD Bank of Highland Park, 203 B.R. 80, 83 (N.D. Ill. 1996) (citing Meyer v. United States, 375 U.S. 233, 236 (1963)). Generally, it may only be applied where three elements are present: "(1) two secured creditors of a common debtor, (2) two or more funds belong to that debtor ('the single debtor rule'), and (3) the paramount creditor has the right to resort to either or both funds, while the junior creditor may resort only to one." Herzog, 203 B.R. at 83 (citing Boone v. Clark, 129 Ill. 466, 480-81, 21 N.E. 850 (1889)).

The single debtor rule normally means that the senior creditor cannot be forced by marshalling to resort to a fund that is "in the hands of a shareholder of the debtor or in the hands of a surety." Herzog, 203 B.R. at 83 (citing DuPage Lumber & Home Improvement Ctr. Co. v. Georgia-Pacific Corp., 34 B.R. 737, 740 (N.D. Ill. 1983)). Exceptions to the rule include "(1) where the corporation is an alter ego of the corporate guarantor and the court 'pierces the corporate veil'; (2) where the guarantor shareholder has committed fraud or other inequitable conduct; and (3) where the pledged asset is found to be a contribution to the capital of the corporation." Id. While an exception has been recognized under Wisconsin law where the fund is in the hands of a shareholder or principal and the fund secures a debt to the corporation, as opposed to merely securing the guarantee of the shareholder or principal, Moser Paper Co. v. North Shore Publ'g Co., 266 N.W.2d 411 (Wis. 1978), the Northern District of Illinois has expressly rejected Moser as being inapplicable under Illinois law. Herzog, 203 B.R. at 84 ("[T]he Court finds that the exception to the single debtor

rule carved out by <u>Moser</u> is not recognized in Illinois. In the context of marshaling, it does not matter whether the funds in question secure a guaranty or directly secure the debtor's note; in either case, the single debtor rule is not satisfied unless another exception recognized by Illinois law applies.").

Here, the Plaintiff asks to force the Defendant to seek repayment of its loan from Mr. Gluth or the collateral granted by Mr. Gluth to secure the loan rather than from the Debtor's estate, and to disgorge the proceeds it obtained from the auction of estate collateral. However, under the single debtor rule under Illinois law, marshalling cannot be applied against a guarantor or collateral granted by someone other than the debtor. The Plaintiff has not alleged any facts to support a contention that the Debtor was an alter ego of Mr. Gluth, that Mr. Gluth's assets were contributed as capital to the Debtor or that Mr. Gluth committed fraud justifying marshalling against his assets. The Plaintiff seeks to distinguish the general single debtor rule by stating that Mr. Gluth "is not simply a guarantor – he is a co-obligor on Debtor's loans and he has pledged his assets as security for the loans." But, as discussed above, this argument was specifically rejected in <u>Herzog</u> as not applicable under Illinois law.

The Court also notes that there is a split between jurisdictions as to whether the trustee can assert a claim for marshalling. Some jurisdictions focus on the traditional rule that marshalling is only applicable between secured creditors. They note that marshalling is a doctrine to maximize the recovery for the junior secured creditor, and therefore is adverse to unsecured creditors, whose interests the trustee represents. <u>See, e.g.</u>, <u>In re Computer Room, Inc.</u>, 24 B.R. 732, 735 n.5 (Bankr. N.D. Ala. 1982). Other courts have held that, since the trustee has the status of a hypothetical lien creditor, it has the right to invoke the doctrine of marshalling. <u>See, e.g.</u>, <u>Azabu Liquidating Trust</u>

v. Beecher, Ltd. (In re Azabu Bldgs. Co., Ltd.), 383 B.R. 738, 745-46 (Bankr. D. Haw. 2008);

Berman v. Green (In re Jack Green's Fashions for Men Big & Tall, Inc.), 597 F.2d 130 (8th Cir.

1979); Farmers & Merchants Bank v. Gibson, 7 B.R. 437 (Bankr. N.D. Fla. 1980).  Courts in the

Seventh Circuit have not ruled on whether a trustee has a right to invoke marshalling, though the

Northern District of Illinois has noted that "Jack Green's and Farmers have been criticized severely."

DuPage Lumber & Home Improvement Ctr. Co. v. Georgia-Pac. Corp., 34 B.R. 737, 742 (N.D. Ill.

1983).  However, since, as noted above, the Plaintiff has not invoked marshalling against any funds

of the Debtor's estate or pled any facts to support an exception to the single debtor rule, the Court

need not decide whether a trustee has a right to invoke marshalling.  As such, the Plaintiff has failed

to state a claim for marshalling.

## Avoidance of Preferential Transfers and Related Claims (Counts V, VI, VII)

11 U.S.C. § 547(b) gives the trustee the power to avoid any transfer of an interest of the

debtor in property:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such
>     transfer was made;
> (3) made while the debtor was insolvent;
> (4) made-
> (A) on or within 90 days before the date of the filing of the petition; or
> (B) between ninety days and one year before the date of the filing of the petition,
>     if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if-
> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment on such debt to the extent provided by the
>     provisions of this title.

11 U.S.C.A. § 547(b) (West 2009).  As discussed above, the Plaintiff has not pled any factual

support for the allegation that the Defendant was an insider of the Debtor.  The Plaintiff has alleged that the Debtor made transfers of money within 90 days before the filing of the petition, making interest payments on the loan to the Defendant of $12,775.57 on March 9, 2007, $14,144.39 on April 2, 2007, and $13,688.12 on May 10, 2007.  (Compl. ¶ 102).  The Plaintiff has pled facts to support the allegation that the payments were made to the Defendant as interest payments on account of the loan it made to the Debtor on March 14, 2000.  A Debtor is presumed to have been insolvent on and during the 90 days preceding the petition date.  11 U.S.C.A. § 547(f) (West 2009).

Certain allegations made by the Plaintiff would tend to indicate that the Defendant was oversecured, and thus was not made better by the transfers than it would have been in a liquidation under Chapter 7.  For example, the Plaintiff alleges that the Defendant has already been paid in full on the loan from the  proceeds of the September 29, 2007 auction of collateral and from a payment by Mr. Gluth.  (Compl. ¶¶ 63-64).  Also, the Plaintiff alleges that the Defendant was so confident that it was oversecured that, despite defaults by the Debtor, the Defendant elected not to exercise its remedies, and instead chose to let interest and fees continue to accrue.  (Compl. ¶ 82).  However, in a motion to dismiss, well-pled facts are to be taken as true, and inferences are to be drawn in favor of the plaintiff.  In re Irmen, 379 B.R. at 307.  As discussed in the next section, the Plaintiff has alleged that the Defendant's liens in vehicles constituting a substantial portion of the collateral are unperfected, and the liens should be avoided.  If avoided, a substantial portion of the auction proceeds that the Defendant received could be returned to the estate.  The Court will draw the inference that, if these facts are true, the Defendant would not be oversecured, and was potentially put in a better position by receiving the interest payments.

Page 25 of 31

Therefore, the Plaintiff has sufficiently pled a claim for avoidance of preferential transfers. While the Defendant has alleged that the payments were made in the ordinary course of business and thus fall within the preference exception in Section 547(c)(2), this argument is irrelevant for purposes of a motion to dismiss, since the preference exceptions in Section 547(c) are affirmative defenses. See, e.g. Tamayo v. Blagojevich, 526 F.3d 1074, 1090 (7th Cir. 2008).

Because the Plaintiff has sufficiently pled a claim to avoid preferential transfers, it has also sufficiently pled the related claims to recover the avoided preferential transfers and to disallow claims until the avoided transfers are returned to the estate.


**Declaratory Judgment with respect to Defendant's Claim (Count VIII)**

The Plaintiff seeks "a determination of the amount due to the Defendant [under its loan to the Debtor] and the validity, priority, and extent of the liens alleged by the Defendant." (Compl. ¶ 127). The Plaintiff asserts that the Defendant's purported security interest in several vehicles is unperfected under state law. To the extent the Plaintiff seeks a determination of the validity and priority of the liens, the claim appears to be a motion to avoid liens under 11 U.S.C. § 544. 11 U.S.C. § 544(a)(1) gives the trustee, upon commencement of a bankruptcy case, the status of a hypothetical judicial lien creditor, and thus gives it the power to avoid any lien or encumbrance on the debtor's property that such creditor could avoid under state law." See, e.g., McRoberts v. WFS Fin., Inc.(In re Church), 206 B.R. 180, 183 (Bankr. S.D. Ill. 1997). The Plaintiff alleges that the Defendant failed to perfect its security interest in the Debtor's motor vehicles and titled mobile construction equipment by not complying with the requirements to deliver the certificate of title to

the Secretary of State for notation of the lien on the title, as required by 625 Ill. Comp. Stat. 5/3-202.

If true, then under Illinois law the Defendant's unperfected security interests in such vehicles would

be "subordinate to a judgment lien such as that held by the trustee in bankruptcy under § 544(a)."

In re Church, 206 B.R. at 183 (Bankr. S.D. Ill. 1997) (citing United States v. Rotherham, 836 F.2d

359, 364-65 (7th Cir.1988)).  The Plaintiff has therefore sufficiently pled its claim to avoid the

Defendant's lien in the vehicles and to determine the validity, priority and extent of the liens on such

vehicles.

To the extent that the avoidance of liens may make the Defendant undersecured, it would not

be entitled to attorney's fees or post-petition interest under Section 506(b).  Therefore, since the

Plaintiff has sufficiently pled its claim to avoid the Defendant's liens, and has alleged that such

avoidance may make the Defendant undersecured, it has also sufficiently pled its request for

determination of the Defendant's claim.


**Surcharge (Count IX)**

As a general rule, "the administrative expenses of a bankruptcy are not to be charged against

secured creditors' collateral," but instead are to be charged against the estate, since the trustee

represents the interests of the unsecured creditors, not secured creditors.   In re Chicago Lutheran

Hosp. Ass'n, 89 B.R. 719, 726-27 (Bankr. N.D. Ill.1988) (citing In re Trim-X, Inc., 695 F.2d 296,

301 (7th Cir.1982)).  However, under 11 U.S.C. § 506(c), the trustee may recover from property

securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or

disposing of, such property to the extent of any benefit to the secured creditor. 11 U.S.C.A. § 506(c)

(West 2009). The trustee, as the party seeking to recover costs, bears the burden of proving either (i) the expenses "were 1) reasonable, 2) necessary, and 3) beneficial to the secured creditor," or (ii) the secured creditor caused or consented to the charges. <u>Chicago Lutheran</u>, 89 B.R. at 727. The Seventh Circuit Court of Appeals has taken a very narrow approach to what constitutes a "necessary" expense, for example finding that expenses incurred after the first date that property could have been abandoned and turned over to the secured creditor are not "necessary." <u>Chicago Lutheran</u>, 89 B.R. at 727-28 (citing <u>Trim-X</u>). Benefit is judged "in a quantitative rather than a qualitative sense," and must have specifically benefitted the secured creditor, not just have generally preserved the assets of the estate as a whole. <u>Chicago Lutheran</u>, 89 B.R. at 728. If the trustee relies on an argument that the secured creditor "consented" to the costs, it is his burden to prove consent, which "will not be easily implied in the absence of express consent." <u>Chicago Lutheran</u>, 89 B.R. at 730. Since creditors are expected and encouraged to cooperate with the reorganization of debtors, mere cooperation is not sufficient to demonstrate consent. <u>Id.</u> Also, once collateral has been transferred from the bankruptcy estate free and clear of all liens, a bankruptcy court no longer has jurisdiction to surcharge such property or impose a lien upon it. <u>Borrego Spring Bank, N.A. v. Skuna River Lumber, L.L.C. (In re Skuna River Lumber)</u>, 564 F.3d 353, 356-57 (5th Cir. March 25, 2009) (citing <u>In re Edwards</u>, 962 F.2d 641, 643 (7th Cir. 1992)).

Here, the Plaintiff has failed entirely to plead what costs and expenses it is seeking, much less explain how such costs were reasonable, necessary or beneficial to the Defendant. Nor has the Plaintiff alleged that the Defendant consented to any such costs. Therefore, the Plaintiff has failed to sufficiently plead a claim for a surcharge against collateral.

## Turnover (Count XI)

The Plaintiff has alleged that the Defendant is in possession of records relating to certain accounts of the Debtor, which are alleged to be property of the Debtor, and which the Defendant has refused to turn over to the Plaintiff even though the Court's order of March 4, 2009 requires parties in possession of the Debtor's assets or other parties to assist and cooperate with the Plaintiff, and even though the Plaintiff has made multiple requests for the documents. However, this "count" does not properly belong in the adversary proceeding. If the Defendant, as a creditor, is not following court orders or is refusing to comply with requests to turn over property of the estate, the Creditor Trustee can bring a motion for turnover or a motion for contempt, as appropriate, in the Debtor's bankruptcy case. Therefore, the count will be denied, but the Plaintiff is given leave to file an appropriate motion, as applicable.

## Motion to Strike

Upon timely motion by a party, a "court may strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f)(2). The Defendant has asked that a number of paragraphs in the Plaintiff's Adversary Complaint be stricken. These paragraphs deal mostly with an alleged failed sale transaction, in which the Plaintiff claims that Mr. Gluth attempted to sell one or more properties that may have belonged to the Debtor to an entity controlled by one of the directors of the Defendant, and sold a right of first refusal in such property to another entity controlled by the same director. Other paragraphs deal with the sale of the Debtor's interest in a joint venture to one of the entities controlled by the director of the Defendant. The Defendant also objects

to paragraphs stating that the Defendant failed to notify the court or the U.S. Trustee of certain accounts not listed in the Debtor's bankruptcy schedules, when it had no duty to do so.

The Court recognizes that the Plaintiff's complaint is lengthy, and the paragraphs cited are of minimal relevance at best. However, because "extraneous allegations . . . are entirely ignorable," the Seventh Circuit has "advise[d] defense counsel against moving to strike extraneous matter unless its presence in the complaint is actually prejudicial to the defense." Alexander v. Northeastern Ill. Univ., 586 F.Supp.2d 905, 915 (N.D. Ill. 2008) (citing Davis v. Ruby Foods, Inc., 269 F.3d 818, 821 (7th Cir.2001)). None of the paragraphs cited are particularly "scandalous" or prejudicial to the Defendant, nor do they make the complaint especially confusing. Also, they may have some relevance at least to the Plaintiff's allegation that the Defendant has a "close relationship" to the Debtor. Therefore, the Court will deny the motion to strike.

## CONCLUSION

For the foregoing reasons, the Court will grant the Defendant's motion to dismiss counts I (deepening insolvency), II (lender liability), III (declaration of insider status), VII (equitable subordination and recharacterization), IX (surcharge), X (marshalling) and XI (turnover). The Court will deny the Defendant's motion to dismiss counts IV (preferential transfer), V (recovery of avoided transfer), VI (disallowance of claims) and VIII (avoidance of unperfected liens and determination of claim amount). The Court will also deny the Defendant's motion to strike. However, the Court grants leave for Plaintiff to file an amended adversary complaint within thirty days consistent with this opinion.

THEREFORE, IT IS ORDERED that

A separate order shall be entered pursuant to <u>Fed. R. Bankr. P.</u> 9021 giving effect to the

determinations reached herein.

DATE: November 25, 2009

The Honorable Manuel Barbosa
United States Bankruptcy Judge